UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
MONIQUE THOMAS and MALIK THOMAS,              :
:                    17-cv-06079 (ARR) (JO)
Plaintiffs,        :
:                    <u>OPINION & ORDER</u>
-against-                        :
:
THE CITY OF NEW YORK, *et al.*,               :
:
Defendants.          :
:
-------------------------------------------------------------- X

ROSS, United States District Judge:

After he was arrested for armed robbery in October 2016, sixteen-year-old Malik Thomas was identified in a series of articles published in the Staten Island Advance (the borough's daily newspaper) and on the newspaper's website, SILive.com. Mr. Thomas and his mother, Monique Thomas (collectively, "plaintiffs"), filed this action on October 17, 2017 against the City of New York, several NYPD officers, and two media defendants responsible for writing, researching, and publishing the articles: Advance Publications, Inc, the owner of the Staten Island Advance, and Maura Grunlund, an employee of the newspaper. They assert a variety of federal and state-law claims arising out of the arrest and subsequent media coverage.

The Staten Island Advance and Ms. Grunlund (collectively, "defendants") have moved to dismiss the claims brought against them. Because I find that the defendants may rely upon either the absolute privilege for "fair and true" reports of an official proceeding or the qualified privilege for media coverage of matters of legitimate public concern, I dismiss the defamation claim. Additionally, because I find that plaintiffs' remaining claims against the defendants fail as a matter of law, I dismiss all other claims and grant the motion to dismiss in its entirety.

1

## BACKGROUND

For the purpose of this motion, the following facts are assumed to be true.[1] On October 10, 2016, Malik Thomas was stopped by three NYPD officers on the corner of Castleton Avenue and Sharpe Avenue in Staten Island, New York. *See* Arrest Report Ex. F, ECF No. 49-2 ("Arrest Report");[2] Corrected Am. Compl. ¶ 24, ECF No. 36-1 ("Am. Compl."). As a suspect in an armed robbery of a cellphone that had occurred about a half-hour prior to the police confrontation, Mr. Thomas was "arrested, handcuffed, photographed, fingerprinted[,] and . . . placed in a cell." Am. Compl. ¶ 26. Officers confiscated both his cell phone and his mother's cell phone, which he had with him at the time of the arrest. *Id.* at ¶ 25. He was subsequently charged with robbery and accused of acting with three other perpetrators to "display[] what appeared to be [a] firearm and forcibly st[eal] a ten dollar bill and an [i]Phone 5." Crim. Compl. at 1 Ex. E, ECF No. 49-2. He was further accused of blocking the sidewalk with his body during the course of the robbery to prevent the victim from running away. *See* Arrest Report. He "remained in custody for more than two days, unable to contact his mother, Monique Thomas." Am. Compl. ¶ 29. Soon thereafter, he was released on his own recognizance, *see id.* at ¶ 59, and approximately three months later, the charges against him were dropped, *see id.* at ¶ 63.

At the time of his arrest, Mr. Thomas was sixteen years old, *id.* at ¶ 90, and struggled with learning and emotional disabilities, *id.* at ¶ 64. He and his mother were survivors of domestic violence and were in hiding from their abuser, Mr. Thomas's father. *Id.* at ¶¶ 15, 47. Despite an

---

[1] The Amended Complaint includes several other factual allegations pertaining to events that occurred many months before Malik Thomas's arrest. *See* Am. Compl. 15–23. However, because these allegations are not relevant to the instant motion, I do not summarize them here.

[2] Though I may only consider certain documents in deciding the defendants' motion, "'it is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6),' including arrest reports, criminal complaints, indictments, and criminal disposition data." *Harris v. Howard*, No. 08 Civ. 4837(CM), 2009 WL 3682537, at *2 (S.D.N.Y. Oct. 30, 2009) (quoting *Vasquez v. City of New York*, 99 Civ. 4606(DC), 2000 U.S. Dist. LEXIS 8887, at *3 (S.D.N.Y. June 29, 2000)).

order of protection, Mr. Thomas's father was actively searching for the plaintiffs. *Id.* at ¶ 55. Out of concern for their safety, they strived to keep their home address and the fact that they lived in Staten Island confidential so that Mr. Thomas's father would not be able to find them. *Id.* at ¶ 47.

On October 11, 2016, the morning after Mr. Thomas was arrested, an article written by Ms. Grunlund was published on SILive.com. *Id.* ¶ 33; *see also* Ex. B at 1, ECF No. 50-4 ("Oct. 11 Article").[3] The article, entitled "Cops: Man Robbed by 4 Suspects with a Gun; 1 Teen Nabbed," identified Mr. Thomas as "Malik Thomas, 16, of Port Richmond Avenue."[4] *See* Oct. 11 Article; Am. Compl. ¶ 36. It stated that Mr. Thomas had been arrested for allegedly stealing a man's cell phone in the Port Richmond neighborhood of Staten Island while he and three other suspects were "armed with a gun." Oct. 11 Article. The article also identified two relevant intersections: the corner where Mr. Thomas was "nabbed" by police officers, and the corner where the robbery occurred. *Id.* Further, Ms. Grunlund reported that, according to police sources, Mr. Thomas was found with the stolen cell phone at the time of his arrest, and that he was accused of "acting in concert with others by blocking the [robbery] victim's potential path of escape." *Id.* The same article was published in the newspaper's print edition the following day, on October 12, 2016. *See* Ex. B, ECF No. 49-2.

---

[3] As I discuss below, the text of the articles published online and in the newspaper are incorporated by reference into plaintiffs' amended complaint and were relied upon in the drafting of the complaint, so I consider them in deciding this motion.

[4] In plaintiffs' first amended complaint, plaintiffs mistakenly wrote that articles written on October 11 and October 13 both disclosed Mr. Thomas's "street address with the exact house number, of which [he and his mother] are the sole residents." *See* Am. Compl. ¶ 36, ECF No. 35. This information apparently came from Joseph Hutchinson III, a relative of Mr. Thomas, and was conveyed "in good faith." First Mot. for Leave to File a Corrected Am. Compl. at 1, ECF No. 36. Upon learning that the information was incorrect, plaintiffs filed a corrected amended complaint, *see* Corrected Am. Compl., ECF No. 36-1, and were granted leave to file the corrected complaint in an August 6, 2018 order from Magistrate Judge James Orenstein.

The next morning, on October 13, 2016, Ms. Grunlund published another article on SILive.com, entitled "Teen Free After Being Arraigned in Armed Robbery." *See* Am. Compl. ¶ 33; *see also* Ex. B at 6, ECF No. 50-4 ("Oct. 13 Article"). Plaintiffs allege that this article, like the articles published on October 11 and October 12, originally named the street where Mr. Thomas and his mother live. Am. Compl. ¶ 36. In the article published on October 13, Ms. Grunlund reported that Mr. Thomas was "released on his own recognizance after being arraigned on felony robbery charges," and repeated the previously-published allegation—derived from police sources, the criminal complaint, and the arrest report—that Mr. Thomas "used his body to block the sidewalk while one of the other suspects demanded the cell phone." Oct. 13 Article. Plaintiffs allege that "[n]one of these assertions of criminal conduct were true," Am. Compl. ¶ 33, and that Mr. Thomas was innocent, *id.* at ¶ 34.

Mr. Thomas and his mother were deeply disturbed by Ms. Grunlund's articles. *Id.* at ¶ 43. They believed that the allegations published in both stories were "untrue, defamatory, and injurious." *Id.* Furthermore, they were concerned that the location information published in the article—the name of their street and the intersections where the arrest and robbery had occurred—compromised their safety and could allow Mr. Thomas's father to locate them. *See id.* at ¶¶ 47, 55, 59, 60, 62.

Ms. Thomas contacted Joseph Hutchinson III, a family member and Mr. Thomas's godfather,[5] for assistance in communicating with the defendants. *Id.* at ¶ 44. She hoped that Mr. Hutchinson would be able to help convince the defendants to "retract the stor[ies] and remove

---

[5] Mr. Hutchinson is identified as Mr. Thomas's uncle and godfather in plaintiffs' complaint, *see* Am. Compl. ¶ 44, but as Mr. Thomas's cousin and godfather (and Ms. Thomas's nephew) in plaintiffs' opposition brief, *see* Pls.' Mem. of Law in Opp'n to Advance Defs.' Mot. to Dismiss 4, ECF No. 50 ("Pls.' Opp'n").

[them] from [the SILive.com] website." *Id.* At the time, Mr. Hutchinson, an attorney, was working in England. *Id.* at ¶¶ 45–47. On October 12, 2016, he "made multiple calls to executives of the newspaper, and spoke with Maura Grunlund . . . and [] Gail Lubin, the Content Director" at the Staten Island Advance. *Id.* at ¶ 45. In his calls, he "disputed the factual allegations" contained in the stories, explained that plaintiffs had retained legal counsel, and expressed concern about the "reputational harm" that Mr. Thomas might experience as a result of the publications. *Id.* at ¶ 46. When his calls did not resolve the matter or result in a retraction or amendment to the stories, he began sending emails to various employees of the newspaper. *See id.* at ¶ 47. On October 16, after learning that plaintiffs were victims of domestic violence and feared for their safety, Mr. Hutchinson sent an email to Brian Laline, the Executive Editor of the Staten Island Advance, and Ms. Grunlund. *See id.* at ¶ 47; *see also* Ex. A at 1, ECF No. 50-4.[6] He asked that the newspaper "remove all identifying information . . . in order to avoid the risk of bodily harm or injury." *Id.*

The next morning, Mr. Hutchinson wrote to Deborah Nettingham, another staff member of the Staten Island Advance, to reiterate that he believed that Ms. Grunlund's articles contained "false information." Am. Compl. ¶ 48. He asserted that Mr. Thomas "was not caught with the victim's cell phone," and that the falsity of the printed allegations was "easily ascertainable from the arrest and court records." *Id.* Throughout the morning of October 17, Mr. Hutchinson continued to send emails and make phone calls to various staff members of the Staten Island Advance. In his

---

[6] As I explain below, I do not consider the declarations provided by plaintiffs in their opposition brief. However, the emails between Mr. Hutchinson and staff of the Staten Island Advance are incorporated by reference in the amended complaint and were relied upon in drafting the complaint, so I may consider them in deciding this motion. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (considering emails in a motion to dismiss because they were "referred" to in the complaint and thus could be deemed "incorporated in the complaint and therefore subject to consideration in [the district court's] review of the adequacy of the complaint"); *Diamond v. Local 807 Labor-Mgmt Pension Fund*, No. 12-CV-5559 (RRM)(VVP), 2014 WL 527898, at *3 n.5 (E.D.N.Y. Feb. 7, 2014) (noting that the court can consider an "exhibit to a declaration in opposition to defendants' motion" if the exhibit is clearly and substantially referenced in the complaint).

outreach to the newspaper, he continued to express concern about both the factual allegations published in Ms. Grunland's articles and the identifying information that he feared could expose his relatives to harm. *See id.* at ¶¶ 49–52.

In response to Mr. Hutchinson's repeated communications, the defendants eventually made two changes to the October 11 SILive.com article.[7] First, at 12:26 P.M. on October 17, they updated the story by removing the word "Avenue," identifying Mr. Thomas as "Malik Thomas, 16, of Port Richmond."[8] *See id.* at ¶ 54; Ex. A at 7, ECF No. 50-4. Plaintiffs also allege that the defendants made the same edit to the October 13 story. *See* Am. Compl. ¶¶ 53–54.[9] On October 17 at 2:04 P.M., in response to continued complaints from Mr. Hutchinson, the defendants removed *all* information about Mr. Thomas's home and neighborhood—identifying him in both articles as "Malik Thomas, 16." *Id.* at ¶ 56. All other factual allegations remained as originally reported, and the only difference between the original and revised articles was the removal of four words: "of Port Richmond Avenue." *See id.* at ¶¶ 56–59.

---

[7] Plaintiffs assert in their amended complaint and in their opposition brief that the October 11 article was adjusted on two separate occasions within a period of a few hours. *See* Am Compl. ¶¶ 53–56; Pls.' Opp'n 6. Plaintiffs also provide a screenshot that reflects the first update, which occurred at 12:26 P.M. on October 17. *See* Ex A at 7, ECF No. 50-4. Additionally, both parties provide versions of the articles that reflect the final changes made on October 17. Though defendants initially disputed this editing timeline in their brief and alleged that the newspaper only made one change to the article, *see* Advance Defs.' Mem. of Law in Supp. of Mot. to Dismiss 3, ECF No. 49 ("Defs.' Mot. to Dismiss"), they do not mention this dispute in their reply brief, *see* Advance Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss, ECF No. 51 ("Defs.' Reply"), after receiving plaintiffs' supporting screenshots and emails. Because I take plaintiffs' allegations in the complaint as true, I assume the truth of plaintiffs' editing timeline.

[8] Port Richmond is the name of both a street and a neighborhood in Staten Island. *See* Pls.' Opp'n 3–4.

[9] Plaintiffs' exhibits do not include the original version of the October 13 article, and defendants dispute the allegation that any changes were made to the October 13 article. *See* Defs.' Mot. to Dismiss 6 n.4. For the purpose of this motion, I assume the truth of plaintiffs' allegations and assume that both the October 11 and October 13 stories initially identified Mr. Thomas's street name and were subsequently updated twice to remove all location information.

Despite these edits, plaintiffs believed that the articles continued to "defame an innocent minor and imperil a terrified family." *Id.* at ¶ 59. They were concerned that the articles still indicated the intersection where Mr. Thomas was arrested—which was just "two blocks from [plaintiffs'] home"—and could potentially be used by Mr. Thomas's father in his efforts to locate plaintiffs. *Id.* at ¶ 60. Further, they were disappointed that defendants failed to retract the criminal allegations contained in the articles, despite the fact that they believed Mr. Hutchinson had provided defendants with "verifiable exculpatory evidence." *Id.* at ¶ 59. After the arrest and the "fear and trauma associated with the Advance articles," Mr. Thomas began to receive treatment for Post-Traumatic Stress Disorder, which continues today. *Id.* at ¶ 64. He has struggled at school, work, and in his social life, and has difficulty sleeping. *Id.* Ms. Thomas has experienced "panic and dread" as a result of her concern for her son and her fear that her family's safety was compromised by the defendants' actions. *Id.* at ¶ 65.

Plaintiffs' amended complaint, filed on August 1, 2018, lists six causes of action against the defendants: (1) defamation per se; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) conspiracy under 42 U.S.C. § 1983 and 42 U.S.C. § 1985; (5) "stigma plus" under 42 U.S.C. § 1983; and (6) punitive damages. Plaintiffs also assert a false arrest claim against the NYPD officers. The defendants are moving to dismiss the six claims brought against them for failure to state a claim upon which relief can be granted.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). I must construe the complaint liberally, "accepting all factual allegations in the complaint as true" and "drawing all reasonable inferences in the plaintiff[s']

favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Though the complaint's factual allegations do not have to be detailed, they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 476 (2d Cir. 2009). Further, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, district courts may also consider documents that are "incorporated by reference in the complaint" and documents that are deemed "integral" to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Additionally, the court may consider "matters of public record . . . including arrest reports, criminal complaints, indictments and criminal disposition data." *Wims v. New York City Police Dep't*, No. 10 Civ. 6128(PKC), 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011). In this case, I consider Mr. Hutchinson's emails to various staff members at the Staten Island Advance, which were included as an exhibit with plaintiffs' opposition brief. These emails are heavily quoted in the amended complaint and they were thus "incorporated by reference" and relied upon by plaintiffs while drafting the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). For the same reasons, I consider the Staten Island Advance and SILive.com articles themselves, which were included as exhibits to both parties' briefs. I also consider the criminal complaint and arrest report, provided as exhibits to the

defendants' motion to dismiss, because they are matters of public record. *Wims*, 2011 WL 2946369, at *2. I rely on these public documents "not for the truth of the facts set forth therein, but [rather] for the fact that the documents exist[]." *Vasquez*, 2000 WL 869492, at *1 n.1.

However, plaintiffs also include additional documents that I decline to consider in deciding this motion. Plaintiffs attach three declarations to their opposition brief: (1) an August 16, 2018 declaration written by Malik Thomas; (2) an August 16, 2018 declaration written by Monique Thomas; and (3) an August 20, 2018 declaration written by Joseph Hutchinson III. These declarations were all written and signed after the amended complaint was filed, and they are neither incorporated by reference in the complaint nor integral to it.

Plaintiffs recognize that these declarations are inappropriate for me to consider on a motion to dismiss, but they argue that I should exercise my discretionary power under Federal Rule of Civil Procedure 12(d) and consider them nonetheless. *See* Pls.' Sept. 24, 2018 Letter, ECF No. 52. Rule 12(d) requires that a court treat a motion "as one for summary judgment under Rule 56" if the court considers "matters outside the pleadings" or the narrow category of other permissible materials on a Rule 12(b)(6) motion. Fed. R. Civ. P. 12(d). Thus, district courts have two options when confronting extraneous documents on a motion to dismiss: "the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988). "The ultimate decision of whether to convert a Rule 12(b)(6) motion into a Rule 56 motion is discretionary." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 357 (S.D.N.Y. 2016). However, if a court chooses to convert a motion to dismiss into a motion for

summary judgment, it must ensure that the parties have notice of the conversion. *See Staveley v. St. Charles Hosp.*, 173 F.R.D. 49, 51 (E.D.N.Y. 1997).

I decline to grant plaintiffs' request.[10] As the defendants point out, plaintiffs' letter appears to be a thinly-veiled attempt to circumvent their pleading obligations and "obtain discovery absent 'a plausible claim.'" Defs.' Sept. 25, 2018 Letter, ECF No. 53 (quoting *Inside Connect, Inc. v. Fischer*, No. 13-CV-1138 (CS), 2012 WL 2933221, at *10 (S.D.N.Y. June 30, 2014)). Where the *opponent* of a motion to dismiss unilaterally provides extraneous information, courts frequently decline to convert the motion under Rule 12(d). *See, e.g.*, *Zoric v. Island Taping, Inc.*, No. 98 CV 4596(SJ), 2004 WL 1447953, at *2 n.3 (E.D.N.Y. June 25, 2004) (excluding affidavits submitted with plaintiffs' opposition brief); *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York*, No. 93 Civ. 4718(KMW), 1994 WL 455553, at *2 n.3 (electing not to convert the motion to dismiss into one for summary judgment where the plaintiffs submitted several extraneous exhibits). Plaintiffs should not be permitted to "amend [their] complaint through motion papers," *U.S. ex rel Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341, 343 (E.D.N.Y. 2013), and, absent any persuasive explanation for why conversion is necessary, I exclude these documents and decide the motion as a motion to dismiss.

## DISCUSSION

### I.    The defamation claim is dismissed.

Plaintiffs claim that the defendants defamed Mr. Thomas "by accusing him of committing the crime of robbery, of having the stolen items [in] his possession, and of acting as a villain and criminal by blocking the path of escape of a victim." Am. Compl. ¶ 70. "To state a claim for defamation under New York law, the plaintiff must allege (1) a false statement about the plaintiff;

---

[10] Even if I did consider plaintiffs' additional declarations, my conclusions on this motion to dismiss would be the same, as these declarations do not change the fact that plaintiffs' claims fail as a matter of law.

(2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (quoting *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010)). In this case, plaintiffs allege that the defendants' statements constituted defamation per se because they charged plaintiff "with a serious crime." *Zherka v. Amicone*, 634 F.3d 642, 645 n.6 (2d Cir. 2011) (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 348 (1992)); *see* Am Compl. ¶¶ 69–72; Pls.' Mem. of Law in Opp'n to Advance Defs.' Mot. to Dismiss 9, 23, ECF No. 50 ("Pls.' Opp'n"). As a result, they argue that they need not prove special damages—a point the defendants do not contest. Instead, the defendants make three arguments: (1) the defamation claims are barred by the statute of limitations; (2) the statements are protected by the absolute privilege for "fair and true" reports of an official proceeding; and (3) the statements are protected by the qualified privilege for reports on matters of legitimate public concern.

### A. Statute of Limitations

"Defamation actions under New York law are subject to a one year statute of limitations." *See Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 224 (S.D.N.Y. 2013); *see also* N.Y. C.P.L.R. § 215. In *Firth v. State*, the New York Court of Appeals adopted the "single publication rule" for allegedly defamatory publications posted on a website, holding that the statute of limitations begins to run from the *initial* date of publication and is not renewed at every "hit or viewing of [a] report." 775 N.E.2d 463, 369 (N.Y. 2002). In adopting this rule, the Court of Appeals declined to treat websites differently from print publications for the purpose of the statute of limitations, despite the fact that articles on websites "may be viewed by thousands, if not millions, over an expansive geographic area for an indefinite period of time." *Id.* at 466. However, the court found that the statute of limitations can be retriggered if a previously-published article or report is

"republished." An article is "republished" only if the publisher makes a "separate aggregate publication from the original, on a different occasion, which is not merely a 'delayed circulation of the original edition.'" *Id.* (quoting *Rinaldi v. Viking Penguin*, 420 N.E.2d 377, 382 (N.Y. 1981)).

In this case, both parties agree that all claims based on the October 11, October 12, or October 13 publications are time-barred, as the articles were published in 2016—over one year before plaintiffs filed their complaint on October 17, 2017. *See* Advance Defs.' Mem. of Law. in Supp. of Mot. to Dismiss 5, ECF No. 49 ("Defs.' Mot. to Dismiss"); Pls.' Opp'n 12–13. However, plaintiffs argue that the two rounds of edits completed by the defendants on October 17, 2016 constituted a "republication," which renewed the statute of limitations and allowed a lawsuit to be filed at any point through October 17, 2017. *See* Pls.' Opp'n 14–15.[11]

A website will not be deemed "republished" simply because the host adds "unrelated information" to a previously-published article. *Firth*, 775 N.E.2d at 466 (holding that the addition of a completely irrelevant report published on the State's website did not render the website "republished" for the purpose of a defamation action); *see also Petro-Lubricant Testing Labs., Inc. v. Adelman*, 184 A.3d 457, 469 (N.J. 2018) (noting that "replacing the article's title and the photograph at the top of the page" constituted "minor" changes, which were not sufficient to revive the statute of limitations). Instead, most courts require that a change be "substantial" in order to trigger a republication. *See Rinaldi*, 420 N.E.2d at 380; *see also Petro-Lubricant Testing Labs.*, 184 A.3d at 468 ("[A] republication occurs to an online publication if an author makes a material and substantive change to the original defamatory article."). Courts consider several factors in

---

[11] To the extent that the plaintiffs suggest that the defendants' decision *not* to remove the story altogether or the criminal allegations it contained is itself evidence of a republication, *see* Pls.' Opp'n 16, this argument is plainly foreclosed by *Firth* and by the "single publication" rule. *Cf. Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1168 (9th Cir. 2011) ("The fundamental problem with Roberts' theory—that a mass communication is republished when the defendant *fails* to retract it after receiving notice of its falsity—is that it undermines the single-publication rule.") (emphasis added).

deciding whether a change is substantial enough to constitute a republication: (1) whether it was made "either with the intent or the result of communicating the earlier and separate defamatory information to a new audience"; (2) whether the changes "were related to the allegedly defamatory content at issue"; and (3) whether a determination that the change constitutes a "republication" "would blunt 'the Internet's unique advantages.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 268 (S.D.N.Y. 2013) (quoting *Firth*, 775 N.E.2d at 467)).

As support for their argument that the changes do not amount to a "republication," the defendants rely heavily on a case recently decided by the New Jersey Supreme Court: *Petro-Lubricant Testing Laboratories, Inc. v. Adelman*. That case, like this one, involved a modification made to a website at the request of the *plaintiff*. 184 A.D. at 461. After the plaintiff accused the website's publisher of posting defamatory information about his alleged biases against "specific groups based on religion, ethnicity, and sexual orientation," the author of the website re-drafted the allegedly defamatory sentence and subsequently re-posted the entire article with the modified sentence. *Id.* In rewriting the sentence, the court found that the changes to the website were not simply "technical or semantic." *Id.* at 469. While the original article accused the plaintiff of supporting "white supremacist materials," the alteration accused him of harboring "anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay rants." *Id.* This change communicated new material that was *itself* defamatory, and therefore it amounted to a republication. *Id.*

In contrast, the defendants argue that the changes made to the articles on October 17 did not "relate" to the allegedly defamatory statements, since the location information published in the articles "has *nothing* to do with what Plaintiffs posit is defamatory." Defs.' Mot. to Dismiss 8. While plaintiffs complain that the criminal allegations reported in Ms. Grunlund's articles were false and defamatory, they assert that the publication of Mr. Thomas's location information caused

fear and emotional distress—*not* that it was defamatory. *Id.* Instead of communicating new allegedly defamatory information, the defendants simply removed four words containing truthful—even if allegedly harmful—information at the plaintiffs' request. *Id.*

Though I agree with the defendants that these changes did not introduce new defamatory information, the subsequent reposting of the article with a notation that it had been "updated" on October 17 nonetheless *resulted* in the reassertion of the previously-published allegedly defamatory material. *See, e.g.*, *Rinaldi*, 420 N.E.2d at 430, 434 (finding that a paperback edition of a previously-published book was a "republication," in part because "the matter which had elicited plaintiff's indignation was left unchanged" in the new edition, and the new edition included a new copyright year); *In re Davis*, 347 B.R. 607, 611 (W.D. Ky. 2006) (holding that a republication occurs "where the defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new audience"). Additionally, the location information is related to the allegedly defamatory criminal allegations, as it served to help identify Mr. Thomas and connect him to the robbery. Furthermore, the removal of four words altered the articles' content, as opposed to merely altering its technical functioning. *Cf. Churchill v. State*, 876 A.2d 311, 319 (N.J. Super. Ct. App. Div. 2005) (finding that an alteration to the "means by which website visitors access [a] report" was merely technical and not a "republication").

At the same time, the edits were not made with the intention of communicating the alleged defamations to a new audience. This differentiates plaintiffs' allegations from those in *Rinaldi*, 420 N.E.2d at 434, which involved the printing and distribution of a new paperback edition of a book, and *Zoll v. Jordache Enters., Inc.*, No. 01 Civ. 1339(CSH), 2002 WL 31873461, at *13 (S.D.N.Y. Dec. 24, 2002), where the defendants incorporated video footage into a new

promotional tape that was then "distributed to a new and different audience." I am also sympathetic to the policy concerns highlighted in the defendants' opposition brief. *See* Defs.' Mot. to Dismiss 9; Defs.' Reply Mem. of Law in Further Supp. of its Mot. to Dismiss 4, ECF No. 51 ("Defs.' Reply"). A determination that the alterations here constitute a "republication" would seem to penalize the defendants for their voluntary attempts to address plaintiffs' safety concerns—thus "reducing the Internet's unique advantages" and discouraging minor changes that would make websites more responsive to their readers. *Firth*, 775 N.E.2d at 467.

Ultimately, I do not need to resolve the "republication" question here, because I find that the defendants are protected by two privileges that shield them from liability. Thus, even assuming that plaintiffs' claims are not barred by the statute of limitations, they still fail as a matter of law.

### B. Fair and True Report Privilege

One of the necessary elements of a defamation claim is the publication of an untrue statement to a third party "*without* authorization or privilege." *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (emphasis added). New York law recognizes a privilege "for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rights Law § 74 (McKinney 2018). Section 74 has been labeled an "absolute privilege" by courts, entitling newspapers and other publishers to complete immunity from a defamation suit as long as the published report is deemed "fair and true." *See Alf v. Buffalo News*, 995 N.E.2d 168, 169 (N.Y. 2013); *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 595 (N.Y. App. Div. 2009) (noting that the statute was "amended to make the privilege absolute" in 1930).[12] The only limitation to the privilege is that the report of the "official proceeding" must be

---

[12] Plaintiffs erroneously argue that the privilege of § 74 is qualified, and can be overcome when the defendant "acts in a grossly irresponsible manner." Pls.' Opp'n 11. This statement misunderstands the relevant doctrinal rules and conflates the *Chapadeau* standard—which is distinct from the absolute privilege of § 74—with the privilege for "fair and true reports." *See infra* Part II.C.

"substantially accurate." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012) (quoting *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005)). A report can still be considered "substantially accurate" if it has "minor inaccuracies"; however, it should "not produce a different effect on a reader than would a report containing the precise truth." *Id.* The standard for "accuracy" is not intended to be overly stringent: "[w]hen determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979).

Mr. Thomas's arrest and the allegations concerning his conduct indisputably constitute an "official proceeding." *See, e.g.*, *Rodriguez v. Daily News, L.P.*, 37 N.Y.S. 3d 613, 615 (N.Y. App. Div. 2016); *Freeze Right Refrigeration and Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 182 (N.Y. App. Div. 1984) (noting that the privilege applies broadly to reports that concern "action[s] taken by a person officially empowered to do so") (quoting *Farrell v. New York Evening Post*, 167 Misc. 412, 416 (N.Y. Sup. Ct. 1938)).

Plaintiffs do not contest the fact that the defendants' October 11, 12, and 13 articles are protected by the "fair and true" report privilege. *See* Pls.' Opp'n 10–11. Indeed, the allegations contained in the defendants' articles came from official records and from police sources whose statements newspapers are entitled to rely upon when drafting an article. *See, e.g.*, *Jeanty v. City of Utica*, No. 6:16-cv-00966 (BKS/TWD), 2017 WL 6408878, at *19 (N.D.N.Y. Aug. 18, 2017) (noting that the reporter "was not required to fact-check the D.A.'s official statements, only to provide a fair and true report of them."); *cf. Abkco Music, Inc. v. William Sagan, Norton LLC*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *6 (S.D.N.Y. May 6, 2016) (finding that an article was entitled to the privilege when it reported allegations contained in a lawsuit without asserting that

they were true). As the defendants note, Ms. Grunlund relied on three sources in drafting the relevant articles: "(a) the official criminal complaint lodged against Plaintiff Malik Thomas, (b) the official arrest report, and (c) on-the-record information provided by the office of the New York Police Department's Deputy Commissioner of Public Information." Defs.' Mot. to Dismiss 10. These sources are similar to those relied upon in *Rodriguez*, where a criminal investigation news report that was based on emails from the NYPD Deputy Commissioner for Public Information was held to be "substantially accurate" and, thus, privileged. 37 N.Y.S. 3d at 614. Furthermore, a newspaper is protected by the § 74 privilege even if the published allegations later turn out to be false. *See id.* at 613 ("The privilege is not defeated by the NYPD's error in identifying the plaintiff by his photograph as the assailant."); *Glantz v. Cook United, Inc.*, 499 F. Supp. 710, 715 (E.D.N.Y. 1979) ("[E]ncompassed within the privilege is the right to publish a 'fair and true' report which contains information that is 'false' as a matter of fact.").

Plaintiffs try to elude the clear protection provided by § 74 by arguing that Mr. Hutchinson's intervention "destroyed" this defense. Pls.' Opp'n 15–16. In other words, plaintiffs argue that Mr. Hutchinson's communications with defendants gave the newspaper a basis for doubting the accuracy of the police sources and arrest documents, and established an obligation for the newspaper to conduct an independent investigation. *Id.* This argument distorts the "fair and true report" privilege, which is intended to be a "safe harbor"—relieving a newspaper of any "duty to investigate and scrutinize the circumstances surrounding [a criminal investigation]." *Elder v. Tronc Inc.*, No. 3:17-cv-01285-WWE, 2018 WL 3233135, at *4 (D. Conn. July 2, 2018). Plaintiffs cite no cases to support their contention that § 74 imposes an obligation to correct or amend a "fair and true" report, and I am unable to find any in my independent research. *Cf. Eubanks v. Northwest Herald Newspapers*, 922 N.E.2d 1196, 1200 (Ill. App. Ct. 2010) (finding that a newspaper

published a "fair and true" report even though a *subsequent* email from the police department demonstrated that the initial report was false). Moreover, such an enhanced obligation would be inconsistent with the purpose of the privilege—to shield from liability as long as a publication accurately reports on an officials' statements. *Jeanty*, 2017 WL 6408878, at *19. The privilege is intended to "protect[] . . . reports of [official] proceedings which are made in the public interest," *Cholowsky*, 887 N.Y.S.2d at 595, and a rule that imposes additional demands and duties on a newspaper would be inconsistent with the goal of increased public awareness.

In this case, both parties agree that the defendants' articles accurately summarize the arrest report, criminal complaint, and statements from police sources. The articles do not state that Mr. Thomas is guilty; instead, they correctly label the accusations as *allegations*. *Cf. Abkco*, 2016 WL 2642224, at *6 (finding that a report on the allegations contained in a lawsuit, "which consistently use[s] conditional language such as 'asserts,' 'maintains,' 'claims,' 'going to be,' and 'alleging,'" was fair and true). Plaintiffs assert that the defendants' decision to re-post the articles after they had knowledge that Mr. Hutchinson disputed the charges required them to retract certain allegations, conduct a more thorough investigation, or make it clear that the allegations were disputed.[13] In making this argument, plaintiffs seem to argue that the "official report" of Mr. Thomas's arrest *includes* Mr. Hutchinson's denials, and that the defendants' failure to note these denials or to use them as the basis for a more thorough investigation rendered their reports inaccurate. *See* Pls.' Opp'n 15.

---

[13] Though I assume, without deciding, that the October 17 edits constituted a republication, the policy implications of plaintiffs' preferred position are also troubling. Because they cite no authority for the argument that there was an obligation to republish, plaintiffs appear to suggest that the defendants' *voluntary* decision to address some of plaintiffs' safety concerns also opened them up to liability when they did not retract the criminal allegations at the same time that they addressed the safety concerns. This would disincentivize any voluntary responses to readers' concerns, and is inconsistent with the policy impetus behind both the "single publication" rule and the "fair and true report" privilege.

As an initial matter, it is not clear that the inclusion of Mr. Hutchinson's denials would have materially changed the meaning of the articles; by reporting only that the police allege that Mr. Thomas behaved a certain way, the articles do not suggest that Mr. Thomas *admits* to the accusations. Furthermore, and more importantly, it is well-established that a plaintiff's side of the story is not itself a part of the official proceeding—and, as such, an article's report can still be "fair and true" even if it does not include denials from the plaintiff or a detailed accounting of the "[plaintiff's] version of the facts." *Smith v. Santa Rosa Democrat*, No. C 11-02411 SI, 2011 WL 5006463, at *5 (N.D. Ca. Oct. 20, 2011) (alteration in original); *see also Glendora v. Gannett Suburban Newspapers*, 608 N.Y.S.2d 239, 240 (N.Y. App. Div. 1994) ("[T]he accuracy of the report was not altered merely because the article did not contain the plaintiff's 'side of the Judge's decision.'").

Plaintiffs cite *Zappin v. NYP Holdings, Inc.* to support their argument that a reporter's omission of the plaintiffs' side of a story can defeat the absolute privilege if it results in a report that "produce[s] a different effect on a reader than would a report containing the precise truth." Pls.' Opp'n 19; *Zappin v. NYP Holdings, Inc.*, No. 16 Civ. 8838 (KPF), 2018 WL 1474414, at *8 (S.D.N.Y. Mar. 26, 2018). But that case is inapposite; the article at issue in *Zappin* reported on a custody and divorce trial, and the plaintiff alleged that the article failed to include important elements of the official proceeding—the trial—*itself. Id.* at *1–2, 8. In contrast, the official proceeding in the instant case is comprised of the statements and reports from the police department; Mr. Hutchinson's denials are not themselves part of the "official proceeding," and the defendants' failure to include them did not render the report inaccurate. Furthermore, the police statements, criminal complaint, and arrest report remained valid—and had not been retracted—at the time of the October 17 revisions; thus, the October 17 version of the article remained a "fair

and accurate" recounting of the official criminal investigation. *Cf.* Defs.' Reply 9 (noting that the charges against Mr. Thomas "remained pending for months").

Accordingly, because the defendants faithfully and accurately described the records and police statements that constituted the "official proceeding" of Mr. Thomas's arrest, the defendants are entitled to protection under § 74.

### C. The "Grossly Irresponsible" Standard

Moreover, even if the October 17 article was *not* a "substantially accurate" account of the official proceeding, the defendants would still be entitled to rely upon the qualified privilege of the *Chapadeau* standard. Where, as here, an article reports on an issue of "legitimate public concern," a plaintiff can only maintain a defamation action if she demonstrates by a preponderance of the evidence "that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch*, 341 N.E.2d 569, 571 (N.Y. 1975). A felony arrest constitutes a matter "within the sphere of legitimate public concern." *Id.* Contrary to plaintiffs' opposition brief, the *Chapadeau* standard is only relevant if the defendants are not entitled to rely upon the privilege of § 74; it does not provide a basis for stripping a reporter of the absolute privilege if it otherwise applies. *See, e.g.*, *Cholowsky*, 887 N.Y.S.2d at 596–97 (considering the *Chapadeau* standard only after "[a]ssuming, arguendo, that Civil Rights Law § 74 was not applicable").

If a newspaper has "no reason to doubt the accuracy of the information supplied," there is no basis for finding that it has behaved with gross irresponsibility. *Robart v. Post-Standard*, 425 N.Y.S.2d 891, 892 (N.Y. App. Div. 1980). As with the "fair and true report" privilege, the standard applies even if the reported information later turns out to be false. *Id.* The relevant inquiry focuses on the actions of the reporters at the time of *publication*. *Ortiz v. Valdescastilla*, 478 N.Y.S.2d 895,

899 (N.Y. Sup. App. Div. 1984). "[A] publisher who reasonably relies on . . . a trustworthy [source] cannot be deprived of the qualified privilege merely because the report is later determined to be without a factual foundation." *Id.* Plaintiffs argue that Mr. Hutchinson's interventions gave the defendants reason to doubt their police sources, and therefore it was irresponsible for the newspaper to continue to rely upon those sources when republishing the article on October 17. As stated before, however, plaintiffs provide no authority to support their argument that the *Chapadeau* standard imposes a duty to correct previously-acquired information—and the law does not recognize such an obligation. *Cf. McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("McFarlane presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast *after* publication." (emphasis added)).

Furthermore, even if October 17 is the relevant date on which to judge the defendants' actions, the plaintiffs cannot plausibly allege that the defendants behaved irresponsibly by failing to conduct a more thorough investigation after learning of Mr. Hutchinson's concerns. The cases that they rely upon—*Hogan v. Herald Company* and *Rushlow v. Plattsburgh Republican Publishing Company*—do not support this argument. In *Hogan*, the reporter was found liable because he engaged in only "casual questioning" of a source and reported that the plaintiff had been arrested, despite receiving inconclusive information regarding that fact. 446 N.Y.S.2d 836, 839, 840–41 (N.Y. App. Div. 1982). Likewise, in *Rushlow*—a case that was decided before the *Chapadeau* standard was articulated—there is no information provided about the source of the defamatory information, and therefore no basis for determining that the informant was reliable or that the reported allegations were grounded in evidence. 28 N.Y.S.2d 867, 867–68 (N.Y. App. Div. 1941). In contrast, the defendants' report in the instant case was amply supported by written

documentation and statements from a trustworthy police source—all of which provided a substantial basis for the published allegations. Mr. Hutchinson's statements to the newspaper gave the defendants notice that the Thomas family disputed the NYPD's official account of the robbery. These statements did *not* provide the defendants with "*substantial* reasons to question the accuracy of the information or the bona fides of [their] source[s];" as a result, their continued reliance on those sources was not grossly irresponsible. *Ortiz*, 478 N.Y.S.2d at 899 (emphasis added).[14]

## II.     The intentional and negligent emotional distress claims are dismissed.

In addition to their defamation claim, plaintiffs assert claims of negligent and intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 73–74. Plaintiffs' emotional distress claims are based on two elements of the defendants' articles: (1) the alleged "misrepresentations and lies" regarding Mr. Thomas's criminal allegations, *id.* at ¶ 76; *see also id.* at ¶ 80, and (2) the publication of plaintiffs' location, *see id.* at ¶¶ 77, 81. *See also* Pls.' Opp'n 21–23. As defendants note, any emotional distress claim that is based on the same conduct underlying the defamation claim fails as a matter of law, because "New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained." *Anyanwu v. Columbia Broadcasting System, Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995); *see also Chaikken v. VV Publ'g Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997) ("[The plaintiffs] cannot avoid the obstacles involved in a defamation claim by simply relabeling it as a claim for intentional infliction of emotional

---

[14] Plaintiffs also argue that the defendants "breached the ethical standards of journalism" by failing to act independently, reporting Mr. Thomas's name, and failing to "[s]how compassion for those who may be affected by news coverage." Pls.' Opp'n 25–26. Even if the defendants breached these guidelines, however, it would not be relevant to the determination of whether they behaved with gross irresponsibility in relying upon the police sources. These sources were sufficiently trustworthy at the time of publication, and thus the defendants cannot be held liable for relying upon them.

distress."). Thus, to the extent that plaintiffs' emotional distress claims are based on the publication of the alleged defamatory statements, they fail on this basis.[15]

Likewise, because plaintiffs cannot plausibly plead the necessary elements to establish either a negligent or intentional emotional distress claim based on the publication of the *location* information, these claims also fail as a matter of law.

### i. The intentional infliction of emotional distress claim fails because defendants' behavior was not extreme and outrageous.

"Under New York law, the tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Restis v. American Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014). Plaintiffs' claim fails on the first prong: their allegations are plainly insufficient to demonstrate that the defendants' conduct was "beyond all possible bounds of decency" or so extreme that it can be "regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). When the defendants initially published the articles, they had no reason to know that the plaintiffs were victims of domestic abuse, and no reason to believe that publishing information about their location or the location of the robbery and arrest could cause harm. Furthermore, even after Mr. Hutchinson intervened and provided them with information about the dangers involved, the defendants' behavior could hardly be considered

---

[15] Plaintiffs argue that this clear rule does not apply to a claim based on defamation *per se*, though they cite no authority for this principle. Pls.' Opp'n 23. This is unconvincing; as defendants note, both defamation and defamation *per se* are based on the same pleading standards. *See* Defs.' Reply 11 n.6 (citing *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 172 n.2 (E.D.N.Y. 2006)). Moreover, the rule applies to all analogous claims that are based on the same underlying behavior. *See Restis v. American Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) ("[A] claim for intentional infliction of emotional distress fails where it falls within the ambit of another tort.").

outrageous: they *did* respond to the plaintiffs' requests to remove the location information, and they ultimately removed all information about Mr. Thomas's home and neighborhood within *one day* of Mr. Hutchinson's email regarding the family's history with domestic violence.[16] Furthermore, the decision to continue to publish the intersections where the robbery and arrest occurred was not "beyond all possible bounds of decency," *id.*, as this information provided important context to the public regarding the robbery.

To the extent that plaintiffs take issue not only with the location information but also with the publication of Mr. Thomas's name, this too is insufficient to meet the standard of "outrageous" conduct. Even if the publication of a minor's name in conjunction with a criminal allegation violates certain journalistic standards, *see* Pls.' Opp'n 25–26, "it was not so extreme and outrageous as to satisfy our exceedingly high legal standard" for intentional infliction of emotional distress. *Chanko v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016); *cf. id.* (dismissing the intentional infliction of emotional distress claim even though the court "do[es] not condone [this behavior]").

### ii. The negligent infliction of emotional distress claim fails because the defendants did not breach a duty owed to plaintiffs.

Plaintiffs' allegations also fail to give rise to a claim for negligent infliction of emotional distress. Though some courts have held that a plaintiff can plead an emotional distress claim grounded in negligence only if he demonstrates that the defendant engaged in "outrageous" conduct, *see, e.g.*, *Sheila C. v. Povich*, 781 N.Y.S.2d 342, 351 (N.Y. App. Div. 2004), plaintiffs correctly point out that there is a split of authority on this question, *see* Pls.' Opp'n 22; *see also*

---

[16] Though Mr. Hutchinson initially began contacting the defendants on October 12 to complain about the publication of the criminal allegations, the amended complaint indicates that he first explained the family's domestic violence history on October 16, just one day before the defendants made the alterations to the articles on October 17. *See* Am. Compl. ¶ 47.

*Taggart v. Costabile*, 14 N.Y.S.3d 388, 398 (N.Y. App. Div. 2015) ("[N]otwithstanding case law to the contrary, extreme and outrageous conduct is not an essential element of a cause of action to recover damages for negligent infliction of emotional distress.").

However, even if plaintiffs do not need to prove that defendants engaged in outrageous conduct, they still must demonstrate that the defendants owed a duty to plaintiffs that they breached, "resulting directly in emotional harm." *Kennedy v. McKesson Co.*, 448 N.E.2d 1332, 1334 (N.Y. 1983). "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *In re Air Crash at Belle Harbor, N.Y. on November 12, 2001*, 508 F. Supp. 2d 244, 247 (S.D.N.Y. 2007) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). Courts have recognized a negligent infliction of emotional distress claim based on the breach of a duty in only a handful of contexts where the "claim possesses 'some guarantee of genuineness'" and the "mental injury 'is a direct, rather than a consequential, result of the breach.'" *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 852 N.Y.S.2d 1, 3 (N.Y. 2008) (citations omitted) (recognizing a duty where plaintiff claimed emotional distress arising from negligent exposure to HIV); *see also Johnson v. State*, 37 N.Y.2d 378, 382 (N.Y. 1975) (recognizing a duty where the defendant negligently provided false information that the plaintiff's mother had died).

In contrast to the narrow category of cases where this type of claim has been recognized, plaintiffs' emotional distress was not a foreseeable cause of the publication of their location, and there is no basis for finding that the defendants owed a *special* duty to the plaintiffs in particular— or that plaintiffs' claim, due to its unique and extreme nature, "satisf[ies] the indicia of genuineness requirement." *Ornstein*, 852 N.Y.S.2d at 3. Furthermore, as the defendants note in their reply brief, to the extent that the plaintiffs allege that the defendants breached their "duty to perform a

reasonable investigation," Defs.' Reply 12, this argument is unconvincing, as I have previously held that defendants' investigation met their obligations under both the "gross irresponsibility" and "fair and true report" standards. Thus, this claim fails as a matter of law.

### III. The federal conspiracy claims are dismissed.

Plaintiffs' federal claims fare no better than their state-law claims. Plaintiffs assert a cause of action for conspiracy under both § 1983 and § 1985. *See* Am. Compl. ¶¶ 85–91. They argue that the defendants "worked hand-in-glove" with the City and the NYPD, and "thereby conspired in a joint venture . . . to ensure that Malik Thomas would be maliciously prosecuted." *Id.* ¶ 88. As an initial matter, both claims fail because plaintiffs cannot plausibly allege that the newspaper defendants—the only defendants at issue in this motion—were acting "under color of law." "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For the purposes of a federal conspiracy claim, "[p]rivate parties act under color of state law if they jointly participate or conspire with a state actor to violate an individual's federal rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005). Though § 1985 "omits the color of law language contained in section 1983," some courts have held that it still "must involve state action since the Fourteenth Amendment proscribes state, not private, deprivation of a citizen's rights." *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803, 814 (S.D.N.Y. 1979).[17]

---

[17] The § 1985 conspiracy claim also fails as a matter of law because plaintiffs make only a conclusory allegation that they were "deprived of the equal protection of the laws" as a result of defendants' behavior. Am. Compl. ¶ 91.

It is well-established that "[a]ctions by journalists in publishing a newspaper article do not constitute the requisite 'state action' to support state action claims." *Idema v. Wager*, 120 F. Supp. 2d 361, 371 (S.D.N.Y. 2000); *see also Skinner v. Dwyer*, No. 91-CV-238, 1992 WL 265995, at *2 (N.D.N.Y. Sept. 9, 1992) ("A newspaper does not act under color of law when it publishes news received from police or other state officials."). Though plaintiffs argue that the defendants' reliance on the fair report privilege *itself* demonstrates that their investigative, writing, and publication actions were taken under "color of law," they admit that there is no authority to support this argument, *see* Pls.' Opp'n 23–24, and, moreover, it is unpersuasive. The "color of law" question turns on the actions of a party at the time of the violation; it does not relate to the defenses asserted by a party in the aftermath of alleged unconstitutional action.

Plaintiffs' conspiracy claims also fail because they are "strictly conclusory." *Ciambriello*, 292 F.3d at 325. To make out a conspiracy claim under either § 1983 or § 1985, the plaintiff "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *K.D. ex re. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013). Plaintiffs fail to do this; they allege only that the defendants "worked hand-in-glove" with the state to engage in unconstitutional conduct, *see* Am. Compl. ¶ 88, but present no "facts tending to show agreement and concerted action." *Fisk*, 401 F. Supp. 2d at 276. Furthermore, even if plaintiffs did sufficiently demonstrate a meeting of the minds, they would have to demonstrate that the defendants conspired to violate the plaintiffs' constitutional rights—in this case, the alleged violation of plaintiffs' Fourth Amendment rights through a false arrest. But, at the time that the defendants published the newspaper articles, Mr. Thomas had *already* been arrested, and there are no allegations that the newspaper or Ms.

Grunlund were involved in the arrest. *See also* Defs.' Mot. to Dismiss 19. As a result, plaintiffs' allegations are insufficient to support their conspiracy claims.

### IV. The federal "stigma plus" claims are dismissed.

Finally, plaintiffs assert a cause of action for federal stigma plus under § 1983.[18] Because defamation is a state-law claim, a federal claim for alleged *government* defamation can be asserted only as a "stigma plus" claim. *See Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). "To prevail on a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* The state-imposed burden, otherwise known as the necessary "plus," involves "a deprivation of a liberty or property interest protected by due process." *Id.* Defendants argue that a "stigma plus" claim is only available when the alleged defamatory statements are made by the government; because the statements here were made by a private actor, they argue, the claim fails. *See* Defs.' Opp'n 20–21.

While it is true that a "stigma plus" claim is typically only available where the statements were made "by the government," *see Augustus v. AHRC Nassau*, No. 13-CV-06227, 2013 WL 6173782 (PKC), at *2 n.2 (E.D.N.Y. Nov. 20, 2013), the Second Circuit has recognized that, in limited circumstances, a plaintiff can plead a "stigma plus" claim when the statements came from an unrelated third party—as long as the government actor imposing the necessary "plus" "adopted (explicitly or implicitly) those statements in doing so." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005). Plaintiffs argue that the defendants' allegedly defamatory statements published in the

---

[18] Plaintiffs style their federal "stigma plus" claim as a claim under both § 1983 and § 1985, *see* Am. Compl. ¶¶ 92–97, but their cited cases only discuss the availability of this claim under § 1983, as it is separate from a conspiracy claim under § 1985.

newspaper articles were subsequently utilized by the government in imposing the "plus"—Mr. Thomas's loss of liberty. Pls.' Opp'n 25. However, the narrow exception recognized in *Velez* does not apply here; plaintiffs provide no facts to demonstrate that the government used the *newspaper's* statements regarding Mr. Thomas's criminal liability when prosecuting Mr. Thomas. Indeed, their allegations support the opposite causative relationship; it was only after the government arrested Mr. Thomas that the defendants reported on Mr. Thomas's arrest and the criminal allegations against him. As a result, plaintiffs' allegations do not support the necessary requirement that the government "either explicitly state[d] the stigmatizing factors or implicitly ratif[ied] some other stigmatizing allegations." *Velez*, 401 F.3d at 88 (emphasis omitted). Thus, this claim is also dismissed.

## CONCLUSION

For the foregoing reasons, all claims against Advance Publications, Inc. and Maura Grunlund are dismissed.[19]


So ordered.


Date:   Brooklyn, New York
        November 5, 2018

                                        _____/s/_____
                                        Allyne R. Ross
                                        United States District Judge

---

[19] Plaintiffs' final cause of action is for punitive damages. *See* Am. Compl. ¶¶ 98–99. As defendants argue—and plaintiffs do not object—"punitive damages is a remedy, not a cause of action." Defs.' Mot. to Dismiss 22; *see also In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456, 492 n.14 (S.D.N.Y. 2010). Thus, this final cause of action is also dismissed.